Philip Kovnett, EEOC, District Court Judge Good morning, Your Honors. May it please the Court, my name is Philip Kovnett. I am counsel for the Appellant, the Equal Employment Opportunity Commission. Joining me at the counsel table is my colleague Kiana Laws, she was the attorney who handled this case in the District Court. And we are honored to represent the EEOC for the Fourth Circuit here. The District Court here erred because it overlooked crucial, undisputed facts. First of all, the parties agree that all fraud investigators performed equal work in this case. And that category encompasses all three of the EEOC's female claimants, as well as four of the six male comparators that the EEOC designated at the summary's judgment stage of the proceedings. It's also undisputed that Alexandra Cordaro and Marlene Green, two female EEOC claimants, were paid less than all four male fraud investigators, despite performing equal work, as well as multiple other male fraud investigators whose salaries are in the record. And based on those undisputed facts, there was a prima facie violation of the Equal Pay Act here, at least as to Cordaro and Green vis-a-vis the male fraud investigators. And the District Court's failure to recognize that prima facie case was incorrect, and that alone warrants reversal and remand for further proceedings. What the District Court did here in assessing the EEOC's was the district judge looked at factors such as experience and credentials of the males in determining whether those males were appropriate comparators in the prima facie stage of the inquiry. And that is not the appropriate analysis, because although factors like experience... On appeal, we've been instructed by the Supreme Court in its Aikens case not to immerse ourselves in the particulars of the proof scheme, but just to ask overall whether the summary judgment record before the District Court justified an award of summary judgment. Right. But in the context of an Equal Pay Act case, the burden-shifting framework is crucial, because a prima facie case that is unrebutted automatically is a violation... We're just supposed to ask ourselves ultimately whether there's an issue of triable fact or not. Right. So to the extent that that's your concern, there is a prima facie violation of the Equal Pay Act as to Cordaro and Green vis-a-vis the male comparators, male fraud. So you're saying the triable issue of fact is to whether there were experience factors or other factors that explained adequately the differences? Right. It's whether the employer here, the Maryland Insurance Administration, satisfied its burden of proof, which is a burden of both production and persuasion, of establishing that factors other than sex, non-discriminatory factors, explain the pay differentials. And because we're at summary judgment and the Maryland Insurance Administration would have the burden of proof at trial, it's an extremely heavy burden to obtain judgment as a matter of law at this stage of the proceedings. So the, you know, these affirmative defenses are important, but the state has claimed that they are required by state law to, where there's a lateral transfer, to give the individual an equal pay and to give the individual a match in pay from the position from which they were transferred. And then the state has said that where there's prior state experience, that gives the employee a bump up, at least in the step of the state civil service pay scale. Now, did the insurance administration vary from those state law requirements in any instance? It did with respect to Homer Pennington, a male who had been at a higher salary than both Cordaro and Green, who also did not have prior state experience, but there is no reason to believe there's no... Well, I mean, you say that about Mr. Pennington, but he had experience. You said he had no experience, but he had experience in arson investigations and he'd served for 30 years as a law enforcement officer. Right. And Marlene Green had served for 20 years as a law enforcement officer, but that doesn't go to state, prior state service, because they were not, those are not creditable, creditable... Well, certainly it's, he wasn't in a private police force, was he? He was in a, I mean, he was in a public police force. Right. But it has to, the state law that they're invoking requires prior experience with certain state entities and it's deemed to be creditable state service. I mean, Ms. Green was also a law enforcement official, I believe for the Baltimore city, and she didn't get any credit for that service. And the notion that Mr. Pennington's the higher pay, it just, it's not borne out in the record because there is no proof that establishes that that credential actually caused the higher pay. There's assertion... I'm just not sure that 30 years as a law enforcement officer is something that the state couldn't give a step up or whatever. That doesn't, I'm just not sure that's gender-oriented. That's quite a long career. I agree. And a jury could see it that way, but a jury could also reject that and say that the experience of 20 years of law enforcement vis-a-vis 30 years in law enforcement is really negligible and cancels each other out. And therefore, sex is the true reason for the pay differentials. Yeah. I'm sorry. Go ahead. Mr. Corbat, I'm understanding what you're saying. Tell me if I'm correct or not, that there isn't any contemporaneous evidence of the reasons for the higher in the record that would support summary judgment. In other words, looking at those like the third and 10th circuit cases that say, while there may be reasons that could explain it, there are not reasons that do in fact explain it contemporaneously in the record. And that is what their burden was at the summary judgment stage. Is that, does that sum up... I couldn't have said it better myself, Your Honor. Just want to make sure. Right. It seems to me that the appellees are asking this court to rewrite the substantially similar test based on an HR letter that said that the positions were not the same. But isn't the test substantially similar? I'm sorry. Appellees are asking this court to rewrite... Well, let me... The HR department concluded that fraud investigators and enforcement officers have substantially equal positions, but they argue that the fraud investigators are not valid comparators because the HR department later concluded that the two jobs were not the same. So what happened to the similar... Right. ...substantially similar test? The standard under the Equal Pay Act is not that the jobs must be identical. It's that they are substantially equal and they involve equal levels of skill, effort, responsibility, and must be performed under similar working conditions. So you would say that the district court erred by not considering that? Absolutely. And the district court took for granted that the standard is that the jobs must be the same and that there is an abundance of case law that would disabuse the district court from that finding. And so the evidence in the record from which a jury could find that the much of it comes from the statements and concessions that the Maryland Insurance Administration itself made to the EEOC during the administrative investigation of this case, in which it conceded that Maurice Zenos and Lawrence Gross, who were the male enforcement officers, were appropriate comparators to Ms. Rogers and Ms. Cordaro, who had filed EEOC charges alleging sex discrimination. And that position statement that MIA submitted to the EEOC was predicated on internal job studies by its own human resources specialist, in which she thoroughly analyzed the duties and responsibilities... Well, why did Zeno, why would specialized experience in the area of title insurance not be relevant? I mean, we are talking about an insurance administration. Right. And it would be relevant if there was something, there's nothing in Mr. Zenos' resume that supports, let alone proves, that he had any background in title insurance. And there's nothing in the record at all that shows the causal connection between that title insurance and the actual pay decision. And it goes to... You're saying he didn't have the background in title insurance? There's no, the citations to the appendix that MIA has invoked for that proposition do not support that proposition. So, I mean, there's nothing in his resume... But is that yes or no? We're saying that there's no reason to believe he did and that it could be interpreted as a post hoc justification that, and we're not denying that such a factor could justify the pay differential, but the burden of summary judgment is to prove that that credential actually motivated the pay decision. And the evidence of the record just does not live up to that standard. So, I think the other thing that I would just point out is that what the district court essentially did is sort of incorporated these uncorroborated assertions from counsel into its decision without considering the experience credentials and prior state experience of the female claimants. And that just violates the principle that the evidence must be construed in the light most favorable to the EEOC before summary judgment is granted against the EEOC. And it also violates the principle that the party having the burden of proof at trial can avoid liability by simply asserting post hoc rationales for pay differentials without actually proffering evidence to support those assertions. So, I don't know that unless the court has additional questions about either the affirmative defenses or the prima facie case, I would be happy to reserve the remainder of my time for rebuttal if that's available to me. Thank you, sir. Thank you. Van Laird Dorsey on behalf of the Maryland Insurance Administration with me today is Deputy Counsel Lisa Hall who handled the case before the district court. We ask that you affirm the decision of the district court because despite what the federal government believes, we believe that there are in fact no material facts in dispute that would Well, is there evidence in the record that a contemporaneous evidence, not post hoc, contemporaneous evidence that shows that's why these male comparators were hired because of that experience? See, that's the difficulty I'm having with your case. I'm sure these differences could explain, but does this record establish as a matter of law that they do in fact explain? That's my problem. So, how do you deal with that? Yes and no. First, Tracy Daly, who is the Director of HR, testified in her deposition, which is in the record, with regard to some of the comparators as to why the experience that they had in fact justified the increased salary. They had greater skill than did the plaintiffs in this case. In addition to that, I would also note that there is in the record with regard to Bruno Conticello, one of the four comparators, there is a specific memo from Carolyn Henneman, who was the associate commissioner in charge of the fraud unit, explaining why it was that he, because of his impressive credentials, he had in fact, he had one of the qualified preferable qualifications in that he was a certified... David, the Henneman memo doesn't mention Conticello's certified fraud examiner designation. I'm sorry? I don't think, correct me if I'm wrong, but does Henneman justify her request for Conticello by mentioning his certified fraud examiner designation? She did not mention that. Right, exactly. So, this is sort of a late breaking thought, it seems to me, perhaps a post-talk rationalization. No, I would say if you look at the advertisements that were issued from the fraud unit, it said specifically that, first, it mentioned that there was a salary range. Right, right, but we're talking about the reasons the hiring decisions were made, and if Henneman doesn't state it in her memo, it could well be the reason, but does this record support it at this stage? Well, I think it does. If you look at her memo, it says, in fact, that he has background and specialized in insurance fraud. So, that was what he did, both when he worked for the state at IWF and at Liberty Mutual. Who are we talking about now? This is Bruno Conticello, who was one of the fraud investigators, who was one of the four that they allege was paid more. In fact, they were paid more, but it was based on their prior experience and on their state service. Mr. Conticello had prior state service. He worked with IWF. Mr. Hurley had prior state service. He also was a certified fraud investigator, and Mr. Jacobs also had prior state service. Weren't there some male enforcement officers and others who were hired at lower salaries than the plaintiffs? I mean, you have Stefanowitz and Bradford, whom I understand were hired at grade 15, step two, and that was two steps lower than female and two of the plaintiffs, and it was three steps lower than Rogers. That's correct. And so, you have situations where men are hired at lower salaries than women are, and I thought that Rogers, who I think, as my recollection is, he was one of the complainants, was also earning a higher salary than some of the male. All that is correct, Your Honor. Mary Jo Rogers was given a step five because she transferred from a different unit within the MIA. Can you help us then, Mr. Dorsey, following up on Judge Wilkinson's question, which of the comparators are you saying benefited from the Maryland state statute that required new hires with prior state experience be given a higher step? Which comparators are you saying benefit from that statute? I'll answer your question first, and then I want to get back to your question, too, because there are several other alleged comparators who they say didn't have the same salary, but I believe they're wrong in that regard, so I'll get back to that. To answer your question, with regard to the four comparators, you have James Hurley, you had Donald Jacobs, and Bruno Conticello all have received a bump up as a result of prior state service. In addition to that, on the producer enforcement side, the two comparators are Maurice Zenos and Jeff Gross, both of whom at work had been contractual employees before they were hired as full-time employees. So again, they would have received a bump up with regard to their salary in that regard as well. But getting back to your question. Before you leave Judge Keenan's question, you've taken those four comparators, and what's the general point you want to make with respect to them? The general point is that they had increased skill as a result of their prior background, and so as a result... Is this in your judgment, or was the prior background, was this mandated by state law? It is both mandated by state law with regard to the fact that they had prior state service for the three of them, and then with regard to all four of them, that they had additional job experience that was a factor that's appropriate. The three of them actually had prior state experience, is that correct? That is correct. And you're also indicating in your comments that there are several male employees that are earning less than some of the female employees. No question about that. Some of them are earning less than some of the plaintiffs. Correct. In fact. Now, take the situation of Pennington and Zeros, who were two of the ones that were pointed to by an appellant. What do you say about that? The Pennington has 30 years experience as a law enforcement officer, but then they point to the fact that one of the plaintiffs had 20 years experience. Now, what do you say about that? So the differential between Mr. Pennington and the plaintiffs is that Mr. Pennington had arson inspection. In addition to having a longer period of experience, he had specific investigation. He had specific experience in arson investigation. Which is directly relevant to the fraud investigation. Now, let's take arson investigations. There are an awful lot of very high price insurance claims that come when people lose their home or whatever. And it's as a result of arson. So it would stand to reason, would it not, that if Mr. Pennington had not only 30 years law enforcement experience, but experience as an arson investigator, that that would be highly relevant to what an insurance administration would want to have. Because we're all familiar with the fact that people, very unfortunately, in order to collect insurance proceeds, set fire to this or that. It doesn't have to be a home, it can be a barn, it can be something. But it happens. And it happens not infrequently. And they would seem to want somebody with the kind of experience that Mr. Pennington had had. All right, now what about Mr. Zenos? Zenos. So Mr. Zenos does have prior experience. Well, they say no, that's flatly incorrect. I believe that if you look at the citations in the record that we have cited to, that it shows that, in fact, he does have experience with title insurance. He has specialized expertise in title insurance and title agents, which the complainants lack. Now, tell me why experience in the area of title insurance? Is important. OK. So this is relating to the comparators who were not within the fraud unit. These are the producer enforcement folks. Their jobs are a very different job, and no one has said otherwise, than the jobs of the fraud investigators. The fraud investigators have six pages of statutes in the insurance article that they have to know. The producer enforcement has to know the entire volume. That's not a matter of my statement. That's a matter of state law. Because, for example, under 10-126A1 of the insurance article, a producer can have his license revoked if he violates any provision of the insurance article. So the producers are going to need to know that. Again, the skill level is going to be very different. With regard to, specifically with regard to title insurance producers, that is a very specialized area that, frankly, not that many people understand. There's a whole series of regulations that apply to title insurance in particular. But your point is, you know, it's just, you can take judicial miss of it. It's important for an insurance agency to have specialized, people who are specialized in certain kind of claims. And Mr. Pennington was specialized in arson, which was something that was not duplicated in the plaintiffs. And Mrs. Zenos was specialized in title insurance and title agents. And that's an important part of an insurance agency's work, too. And you'd want that kind of expertise. You'd want it. We want it, and we want to be able to pay for it. All right. So what you're saying is that these justifications are apparent from the record in the sense that many of them were required by state law, either in order to make a salary match or in order to provide a bump up from the fact that there was prior state experience. That this, that there are neutral, gender neutral explanations in terms of the insurance administration's job that explains the decision that we're making and what Judge Mott properly took into account. We certainly believe that this is an appropriate case for summary judgment. Let me ask this further. That is, there's a problem here that because the Supreme Court is increasingly looking at it, the state, a lot of, most of these state civil service systems, they run, they're highly regulated, and they run on very strict standards of state law. But the states do have a sovereign interest in their own workforce. Of course. Yes, I agree. And then the Supreme Court is making that, I mean, I think it's more and more attentive to that, that they do have a sovereign interest in their own, in their own workforce. And that the extension of federal power and federal investigations into that sovereign interest, when it occurs, should incur with a stronger case than this one. And I guess what I'm saying here is that, yes, there can be situations because the state itself has remedies, there's state law remedies for this kind of gender discrimination. And so the question is, should the reach of federal power reach into state civil service systems and these sorts of, and state government without at least a stronger case than this one? And so I'm asking you to, because there is a federalism dimension to this. And we do live within a federal system here. And so I'm just asking you to reflect on that general point about the state's sovereign interest being something that would factor a way into the balance. I think that can be a factor, especially given the fact that we have a salary system that is on its face, gender neutral, that in this particular case, there were 11 fraud investigators who all received the same pay as two of the plaintiffs in this case. That's a factual correction that I need to make with regard to something that the EEOC said. All of them received grade 15, step four, or after the increase. What you have here is a combination of state law, which required you to do what you did, which you followed. And then you have also explanations in terms of the particular specialties that some of the male hires brought to this. Plus, you also have situations where male hires were actually paid less. That is true. They could have brought an Equal Pay Act claim on this basis. So it's not just one thing. It's the combination of the state law and the prior experience and the fact that male comparatives, that male employees are sometimes paid less. And the question is whether a state that pursues its work in this kind of way should be subject to this kind of federal incursion. And I think this structural feature of our Constitution is something that's earning respect and attention at the court. The state salary plan, it allows for variation of salary based on relevant experience, such as professional designations and for state service. That is what has happened in this case. And that is unrefuted, I think, in the case. I have, my time is beginning to run out. I did want to address one point with regard to the JOBS study. An argument was made in the brief of the EEOC that the JOBS study found that the positions were the same in the sense that they both investigate insurance fraud. But that is not what the JOBS study said. That's not what Carla Harrison said in her deposition. What the JOBS study actually says, and this is at page 176 of the record, the primary purpose of the study positions is to investigate insurance fraud. The study positions were actually the fraud investigator positions. And to prove this, you look at the second, the follow-up sentence. It says, however, the study positions will be compared to the enforcement officer positions to establish if there is a great determining difference between the positions. So, they were not saying, in fact, that the producers of producer enforcement does fraud insurance. That's a separate job. And in fact, Carla Harrison is very clear about that. Nancy Grodin, who is the deputy commissioner, who had been both associate commissioner for producer enforcement, and also had been in charge of the fraud unit, also testified about the fact that the jobs are different jobs. So, it really is not a fair comparison. And they're not substantially equal to the position of the fraud unit. Well, didn't the judge, I mean, what happened to the test is substantially similar in this case? So, I would say that they're not substantially similar at all. Because, in fact, they're very different jobs. You know, it's, if you look, for example, at, you know, a math teacher and a science teacher, those are, this court has said, those are different jobs. And in fact, while they're both investigators in this case, the jobs that they do are very different jobs. That's why I pointed, I used my visual aid, the insurance article, the scope and the skill level for the producers is a very different thing. Jeff Gross, who actually had a producer's license, and, you know, the records in here is that it, that's a difficult thing to obtain. So, he actually knew the entire volume and what he was supposed to do. The agency itself made the determination that they were substantially equal. That the MIA decided to classify the two types of investigator in the same compensation range, because a job study found that both positions, quote, performed substantially equal work, share a single, quote, primary purpose, end quote, rank equally on all factors. Well, that's not what you're saying here. So, that, it's consistent with what I'm saying here. Why? Because the analysis that was done in that case was not an equal pay analysis. Right. It was not. But they're saying that it's substantially equal work. And isn't that the analysis that? Carla, Carla Harrison, who wrote this job study, said in her deposition that she was not saying that they're the same job. In fact, she was saying. No, but they're substantially equal work is what she said. Those were her words. This is for the purposes of reclassifying a unit in terms of getting it up to a similar grade. In the same compensation range, based on her conclusion, they performed substantially equal work. But that's not the same, if I may. That is not the same thing as saying that that is substantially similar job. Because the job that they do. What's the difference between the job and the work? The job is, again, it is the skill level that is involved with regard to the producer enforcement is a different skill. I'm not saying it's a more important skill. It's a different skill. And under the Equal Pay Act, that is not an appropriate comparable. Because, again, a math teacher and a science teacher are not the same job. It seems to me that I'm carrying on to a slightly different point. You're trying to make the argument, because some males were paid less, that they don't have an Equal Pay Act case. And that's not their burden. Their burden, if I'm correct, is to show that there is a male comparator. Who performs substantially equal work, who was paid more. Isn't that correct? So the fact that others were paid less does not mandate summary judgment in your favor. Their burden is to show the existence of a male comparator who performs substantially equal work, who was paid more. Is it not? I would argue that under the Stragg case, that the comparators that they've used. Well, no, no. Answer my question. Isn't that their burden? Their burden is to show that it's substantially equal work. I don't believe that they've met that burden. Okay. And for two reasons. One is the comparators are not accurate with regard to the producer enforcement unit. And with regard to the fraud unit in particular, you're allowed to look at the experience level. And so it's not the same level of skill as the others who were brought in. So they've talked about the other comparators within the fraud unit. These nine comparators. But they all were given the same salary based on the same grade and step. And if I can, Todd Young I think is a good example of that. He was hired on July 1st of 2009 at $44,610. Subsequent to that, there was a salary reduction across the board as a result of the economy. All state employees were subject to being furloughed. And then when Alexandra Cordaro was hired on December 2nd, 2009, her salary, which was less than Mr. Young's starting salary, $43,405. And here's the important point. On that date when she was hired, her salary and Mr. Young's salary were exactly the same. And that is true with regard to every one of the other nine comparators that they referenced in their brief. Setting apart. Okay. And you've answered my question. Thank you. I'm sorry. Setting apart. The red light is on. I'm sorry. Unless there are further questions. Zello said, because see. Thank you. Mr. Kovnath, you've got some time for rebuttal, sir. Thank you, Judge Wilkinson. I think I'll start where we left off with respect to this notion that because there were some males that were paid equally, or I guess the reference to Mr. Bradford and Mr. Stefanowicz is that they were paid less, that somehow that defeats the Equal Pay Act claim. There's no, the burden on the plaintiff is to identify males. No, not by itself. It's just, but surely in terms of deciding whether there's an issue of tribal facts, surely that weighs into the equation. Correct. Again. And you would agree that some of the male hires were paid less than M.S. Rogers, or some of the other female plaintiffs? So with respect to Mrs. Rogers, she came in in 2005 as an investigator in the Property Hazulty Unit, and she was making $36,000, and then was hired into the Fraud Unit in 2011, making $46,000. But in that interim time, in 2007, or I believe 2006 and 2007, the male Harrington, Hurley, and Jacobs were making $35,000, and were making significantly more, fewer years of experience within the organization than Ms. Rogers. So the notion that her salary, which was $900 more than their starting salary four years earlier, undermines the equal pay analysis is, I just don't think, we're not saying that she has a prima facie case against those males. But if you look at Bruno Conticello, he was hired almost a year before Ms. Rogers, and he was paid $3,000 more than she was. So I think it's a person-to-person analysis, and individuals must be compared to other individuals of the opposite sex. Well, what you're saying, it seems to me you're clouding the issue. As I understand your point, is she's got to identify a male comparator who performed substantially similar work, who was paid more. Correct. And there are three... Okay, so why... Okay. I'm just saying that the fact that... So tell us then who you've identified, and why that's... You say Mr. Conticello. And Maurice Zenos and Lawrence Gross, who were hired well after her at $5,000. And they were all fraud investigators. Zenos and Gross were enforcement officers. Okay. And so... Why do you need to get into the argument of enforcement officers in this case? We don't need to, other than that... I mean, it's our view that a jury could find that they perform substantially equal work, and that they're therefore valid comparators. I don't think this court necessarily has to reach that issue to reverse the grant of summary judgment, because a jury could certainly find a violation just comparing the fraud investigators. How large a workforce are we dealing with here? Well, it's a little unclear from the record. MIA has identified about 28 fraud investigators in the record. It's pointed to one, specifically in its brief, Todd Young, who was paid equally to Ms. Cordaro. No, no, no. I mean, what's the total universe of employees that we are dealing with in both of these units? So there's... The enforcement and the fraud investigator. What's the total universe? How many employees are we dealing with? It's not clear in the record, other than there were 290 pinned positions in all of the units, which I believe was four separate units. And I'm just not in a position to know. It also depends what time frame you're talking about. 290, right? Correct, out of four units. Okay. So of course, with 290 people, you can go and cherry pick the comparators and say, okay, this one's paid less and this one's paid less than that one. And I would be surprised if I were sifting through 290 people, if I couldn't find a large number of male plaintiffs who could bring an Equal Pay Act claim, but it wouldn't be any good because you can be so selective. I could pick this and this and that. I mean, it's not that hard to do, but the point is, these differences that you point to, if there were no explanations for them, and then every time you give an explanation, it's not always post-hot, that either it's true or it's not true, and it's relevant or it's not relevant. Conicello, for example, was a certified Freud examiner, okay? Certifications mean something. Now, did any of the claimants possess this kind of certification? No, but the job announcement that MIA is pointing to, which said that the certified fraud examiner was a preferred designation, also talks about prior fraud investigative experiences as a preferred designation. But if it's a preferred designation, wouldn't it be something that the agency was entitled to take into account? Certainly, and again, it's something that could justify the pay differential, but a jury would not be compelled. Why wouldn't it? It's a gender-neutral explanation based on a criterion which was designated a preferred qualification, and which is directly relevant to what the insurance agency is supposed to be doing, which is investigating fraud. Mr. Conicello has a certified fraud examiner. We encourage people to get certifications. They go through courses. Absolutely, and any type of background experience could be relevant to the pay decisions, but as Judge Keenan pointed out, the contemporary... It does not be relevant. It is relevant. The problem is that they haven't drawn the causal... Is it gender-neutral? It is. We're not saying that it... Is it relevant? It's gender-neutral? But there's no proof that it is what motivated the pay decision to give Mr. Conicello $3,000 more than Ms. Rogers. Ms. Rogers' experience was just as impressive. I thought you were saying that none of the plaintiffs had a certified fraud examiner. They don't, but they have other credentials that were also preferred designations or preferred experience. And if you're considering the evidence in the light most favorable to the EEOC... Well, you might as well be an insurance commissioner. I mean, one of the things that troubles me is I don't doubt that there are cases that could be brought. I would just think and hope that before a state sovereign interest is compromised in this way, that it would be a stronger case than this. Because I think there's an explanation, not an off-the-wall explanation, but an explanation that is highly relevant to the exact kind of work that this agency is charged with doing. And the problem here is I realize that it is so objectionable to even refer to a state sovereign interest to you and everything, but it is important in terms of our federal system. And I would think that you would have a stronger case than one in which there are gender-neutral explanations for what happened here and in which the comparatives did not all collapse. Your Honor, I think what you're suggesting is some sort of 11th Amendment interest that would elevate states to a different standard under the Equal Pay Act or any other employment insurance. I'm not saying that. I'm saying that they do have a structural and recognized place within our constitutional system, that there are state remedies, and that ultimately it bottoms out on whether you have a strong enough case to justify what you're doing. I understand Your Honor's concern. It was not something that was brought up at any point in the litigation, and so I'm not fully prepared to talk about it. Forgive me for my reference to constitutional structure. I understand the concern. It's just that MIA has never disputed that they are subject to the Equal Pay Act and that the standards are the same. I'm not disputing that either. Okay. It is, as in so many other cases, a question of degree. And I'd be the first one to say if you had a good case, fine, I'm all for it, and I don't dispute for a minute the applicability of the Equal Pay Act. I'm just saying where you have a, what might generously be described as a marginal case, that a certain respect for constitutional structure would have suggested a course of caution. I understand Your Honor's concern. I'm speaking only for myself. Does the Court have any additional questions? I can talk about the... I think your time's expired. Oh. I'm sorry. Thank you, Your Honor. We thank you both, and we'd like to come down and greet counsel. We appreciate both of your arguments. This Honorable Court stands adjourned until tomorrow morning. God save the United States and this Honorable Court.
judges: J. Harvie Wilkinson III, Barbara Milano Keenan, Henry F. Floyd